1   Mary McNamara, SBN 147131
    Britt Evangelist, SBN 260457
2   SWANSON & McNAMARA LLP
    300 Montgomery Street, Suite 1100
3   San Francisco, California 94104
    Telephone: (415) 477-3800
4   Facsimile: (415) 477-9010

5   Attorneys for Defendant JOHN BUI

6

7

8                       UNITED STATES DISTRICT COURT

9                     NORTHERN DISTRICT OF CALIFORNIA

10  UNITED STATES,                          No. CR 09-00770 SI

11                        Plaintiff,        **DEFENDANT'S SENTENCING**
                                            **MEMORANDUM AND MOTION FOR**
12              v.                          **SECTION 3553 VARIANCE**

13  JOHN BUI,                               Date:    March 5, 2010
                                            Court:   Hon. Susan Illston
14                        Defendant.        Time:    11:00 a.m.

15

16

17

18

19

20

21

22

23

24

25

26

27

28  Def's Sent. Memo.

1

2

## TABLE OF CONTENTS

3 TABLE OF AUTHORITIES ....................................................... iii

4 I.     INTRODUCTION ......................................................... 1

5 II.    ARGUMENT ............................................................. 2

6 Factor 1:
    A.     History and Characteristics of Offender

7

8         (I).    Extraordinary Acceptance ....................................... 3

        (ii).    Extraordinary Family Circumstances ........................... 6

9

10 Factor 1:
    B.     Nature of the Offense ............................................... 13

11

12 Factor 2:
The Purposes of Sentencing (Just Punishment/Retribution;
Specific Deterrence; General Deterrence; and Rehabilitation) ..................... 16

13

14 Factor 3:
The Kinds of Sentence Available (i.e. Alternatives to Prison) .................... 18

15 Factors 4-5:
The Sentencing Guidelines and their Policy Statements
16 (Which Are, after *Booker,* Advisory) ........................................ 19

17 Factor 6:
18 Avoiding Disparity in Treatment of Similar Offenders ........................... 23

Factor 7:
19 The Need to Provide Restitution ............................................. 23

20 III.    CONCLUSION ......................................................... 23

21

22

23

24

25

26

27

28

Def's Sent. Memo.              ii

# TABLE OF AUTHORITIES

*Gall v. United States*, 552 U.S. 38 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22-23

*Kimbrough v. United States*, 552 U.S. 85 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Spears v. United States*, __ U.S., __, 129 S. Ct. 840 (2009) . . . . . . . . . . . . . . . . . . . . . . . . . 19

*United States v. Aldelson*, 441 F. Supp. 2d 506 (S.D.N.Y. 2006) . . . . . . . . . . . . . . . 21 & n. 8

*United States v. Antonakopoulos*, 399 F.3d 68 (1st Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . 7

*United States v. Gaind*, 829 F. Supp. 669 (S.D.N.Y. 1993) . . . . . . . . . . . . . . . . . . . . . . . 17, 18

*United States v. Gonzalez-Zotelo*, 556 F.3d 736 (9th Cir 2009) . . . . . . . . . . . . . . . . . . . . 19, n. 8

*United States v. Goss*, 549 F.3d 1016 (5th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, n.3

*United States v. James*, 592 F.3d 1113 (10th Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, n.3

*United States v. Joyeros*, 204 F. Supp. 2d 412 (E.D.N.Y. 2002) . . . . . . . . . . . . . . . . . . . . . . 17

*United States v. Khatami*, 280 F. 3d 907 (9th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . 3, n.1

*United States v. Lehman*, 513 F.3d 805 (8th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9-10

*United States v. Lenagh*, 2009 WL 296999 (D. Neb. Feb. 6, 2009) . . . . . . . . . . . . . . . . . 21, n. 8

*United States v. Leon*, 341 F.3d 928 (9th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*United States v. Menyweather*, 447 F.3d 625 (9th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . 7-8

*United States v. Olis*, 2006 WL 2716048 (S.D. Tex. Sept. 22, 2006) . . . . . . . . . . . . . . . . . . 18

*United States v. Redemann*, 295 F. Supp. 2d 887 (E.D. Wis. 2003) . . . . . . . . . . . . . . . . . . . 17

*United States v. Sclamo*, 997 F.2d 970 (1st Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*United States v. Spero*, 382 F. 3d 803 (8th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

# I.     INTRODUCTION

Mr. Bui fully accepts responsibility for his fraudulent conduct.  As a broker, he dishonored his profession by aiding fraud, profiting from it, and helping in his individual way to perpetuate the gold rush mentality that created the housing boom and bust.  The defense does not question that a sentence of imprisonment is warranted here.

Mr. Bui accepted full responsibility for his actions very early in this case as follows:  He fully confessed his conduct to the FBI and cooperated in the government's forfeiture of all of his assets, he entered into immediate plea negotiations with the government and stipulated to a forfeiture judgment of $3.5 million, with guaranteed payments of more than three quarter of a million dollars, representing the last of his assets.  Mr. Bui's conviction results in the permanent loss of his broker's license, the ending of his life's career in real estate and the permanent sanction of a forfeiture and other money judgments which he will never be able to satisfy.

Mr. Bui has two children, one of whom is a five year old severely autistic son named Justin.  Justin has the language skills of an infant under the age of two, is not reliably toilet trained, is hyperactive, prone to tantrums and requires 24 hour supervision.  Before his incarceration, Mr. Bui was the parent who had primary interaction with Justin's teachers and therapists.  Mr. Bui also slept with Justin at night, fed him and brushed his teeth (an operation that otherwise requires two people to hold the child down while a third brushes the teeth).  Mr. Bui was an extremely involved parent.  Since Mr. Bui's  incarceration, the full brunt of the strain of taking care of Justin has fallen on Linne Tran, Mr. Bui's life partner.  Although both Mr. Bui and Ms. Tran have siblings in the Bay Area, Justin's disability is such that he requires constant supervision by someone who is able to give intensive parental-type care.  Autistic children with Justin's level of impairment react extremely poorly to changes in routine and quickly go into uncontrollable tantrums when exposed to new people or situations.  There is nobody in the larger family who can move in with Ms. Tran, establish the requisite bond with Justin and assume a parental role with him.  Ms. Tran's efforts to cope alone are driving her to a breaking point.  As

Def's Sent. Memo.                              1

she poignantly states in her letter:

> My situation is desperate. Taking care of Justin alone is really hard, he needs infinite patience and energy. To put it bluntly, caring for Justin is a life sentence for us and John was living that life sentence with me every day.

Letter of Linne Tran, attached as Exhibit C to McNamara Decl.

Mr. Bui is the eldest of six siblings, all born in Vietnam, who escaped after the Communist takeover. Mr. Bui's abusive father was killed in the war, and from a very young age, Mr. Bui assumed the paternal role. By the age of 14, he was going to school in this country, caring for his infant sisters and working at night to support the family. In the thirty-two years since, Mr. Bui has rescued his family from creditors, bought his mother, brother and sisters homes, employed all but one of his siblings, given untold financial assistance to nieces and nephews and saved doggedly to provide for his immediate family, especially Justin. Mr. Bui's own lifestyle is marked by its frugality. He never spent money on himself. Now, everything that he saved is gone – forfeited to the government . The trusts that he opened for the care of his sons have been seized, the houses bought for his mother and siblings foreclosed upon, his commercial real estate under water and the subject of litigation. He is financially ruined and will never recover from the penalties imposed in this case.

Based on all of these circumstances, the defense requests a variance from the guidelines to a sentence of 25 months, which represents half the low end of the current guidelines range.

## II.    ARGUMENT

Whether viewed in terms of the guideline terminology of extraordinary acceptance/extraordinary family circumstances or section 3553 factors, this case presents compelling circumstances for a variance from the guidelines. The seven factors listed in 18 U.S.C. § 3553(a) are:

1.    The nature of the offense and the history and characteristics of the defendant;

2.    The purposes of sentencing (Retribution; Specific Deterrence; General Deterrence; and Rehabilitation);

3.    The kinds of sentence available (i.e. alternatives to prison);

4-5.    The Sentencing Guidelines and their Policy Statements (which are, after *Booker,*

1   advisory);  – loss guideline can be ignored

2   6.      Avoiding disparity in treatment of similar offenders; and

3   7.      The need to provide restitution.

4   **Factor 1:**

5   **A.      History and Characteristics of Offender**

6           **(i).      Extraordinary Acceptance**

7           On May 19, 2009, the FBI executed a search warrant at Mr. Bui's business premises.

8   PSR ¶ 12.  Although he lied to the agents about the reasons for why he had shredded most of the

9   mortgage files in his office, Mr. Bui confessed the full scope of his fraudulent activities,

10  admitting that 70-80% of the loan applications originated by his office contained false

11  employment information relating to the borrowers.  *Id.*  The plea agreement is based on this

12  confession, and reflects 70-80% of the money that Mr. Bui obtained from his business in the

13  relevant time period.  Mr. Bui immediately entered into plea negotiations with the government

14  and the entire case was concluded on the basis of Mr. Bui's confession, with virtually no

15  discovery, no motions and no expenditure of resources by the FBI or the government in

16  preparing the case.

17          As part of his acceptance of responsibility, Mr. Bui admitted to obstruction of justice

18  because of the shredding.  He also admitted to witness tampering, although the circumstances of

19  that charge demonstrate the least serious type of tampering conduct, namely, a request to a

20  witness to remain silent, as opposed to affirmatively lie to authorities.[1]  In addition, the witness,

21  CI-2, was a close friend of Mr. Bui's whom he had helped generously in the past (with college

22  tuition for CI-2's child).  Mr. Bui was told by his mother that CI-2 had been interviewed by the

23  FBI and that they knew everything.  It was in this context that Mr. Bui asked CI-2 to not provide

24

25          [1] While the Ninth Circuit has yet to decide whether simply encouraging a witness to
26  withhold information can be considered witness tampering through corrupt persuasion.  *United
    States v. Khatami*, 280 F. 3d 907, 913-914 (9th Cir. 2002) (declining to decide this issue where
27  the defendant encouraged witnesses to lie to investigators), other circuits have held that such
28  conduct may qualify as corrupt persuasion and Mr. Bui did not contest the charge.

1    further information to the FBI.  *Id.*, ¶ 20, p. 8, (penultimate paragraph).

2         In order to evaluate what Mr. Bui's confessed 70-80% fraud figure translated to in terms

3    of his gain under the guidelines, the government requested that Mr. Bui complete an 18 page,

4    multi-part Department of Justice Financial Statement ("DOJ Financial Statement").  Immediately

5    after his arrest in May, undersigned counsel worked with Mr. Bui's longtime business lawyer,

6    Jeffrey Weiss, to perform extensive due diligence in order to complete this statement.  The task

7    was arduous, requiring hours of meetings between Mr. Bui, Mr. Weiss and the undersigned, the

8    assembly of backup documents and the drafting of detailed explanations for many of the entries

9    in the statement.  Weiss Decl. ¶¶ 10-11.  Mr. Weiss and undersigned counsel personally met with

10   AUSA Rabkin to explain the various entries on the statement.  *Id.* ¶ 11.[2]  Mr. Bui came to plea

11   terms with the government as soon as this financial statement was completed, and he pleaded

12   guilty in August, 2009.

13        The terms that the government demanded were onerous.[3]  Using the disclosures in the

14   _____

15        [2] The suggestion of the Probation Officer (revealed for the first time in the Justification
     portion of the PSR at p. 2) that Mr. Bui's family members may be holding undisclosed cash
16   received from him is completely baseless and has no place in the PSR.  The government has
     never raised any question about the accuracy and truthfulness of the financial statement.  Further
17   the evident suffering of the Bui family (many of whom are being evicted from their residences),
     in addition to the due diligence performed by Mr. Weiss, who, as Mr. Bui's sole business lawyer
18   for nine years is in a position to know Mr. Bui's finances, make it highly unlikely that any assets
     are being concealed.  *Id.*, ¶¶ 2-4, 11-12.  Likewise, the Probation Officer's suspicions about Mr.
19   Bui's setting up accounts in the names of  "others" (Justification, p. 3) are wholly unfounded.
     The others in question are Mr. Bui's brother, David, whom he employed, and a prospective
20   business partner.  It was Mr. Bui who disclosed the existence of these accounts to the
     government.  *Id.*, ¶ 6.
21

22        [3] Although it is true that the plea agreement is based on Mr. Bui's gain, rather than loss, it
23   is important to note that the assessment of loss is an exceedingly complex and time-consuming
     process in mortgage fraud cases, because a fact intensive "loan-by-loan inquiry" is indicated.
24   *United States v. Goss*, 549 F.3d 1016, 1018 (5th Cir. 2008) (vacating sentence calculated using
     full value of loans as loss amount).  In cases where collateral was pledged to the victim, the net
25   loss to the victim must be calculated by subtracting "the amount the victim *has recovered at the*
     *time of sentencing from disposition of the collateral*, or if the collateral has not been disposed of
26   by that time, the *fair market value of the collateral at the time of sentencing*."  U.S.S.G. § 2B1.1
     app. n.3(E)(ii) (emphasis added).  Further, all interest and finance charges incorporated into the
27   loan amount must also be deducted to reach the actual loss amount in this case.  U.S.S.G. §
     2B1.1 app. n. 3(D)(I).  Thus, evidence would have had to have been produced of both the
28

     Def's Sent. Memo.                              4

financial statement, the government required Mr. Bui to forfeit everything that he had gained out

of his illegal conduct for a stipulated judgment of $3.5 million with a pre-payment of

$460,639.21 by October 20, 2009 (paid with an overage) and an additional payment of

$361,428.58 in May, 2010, when certain financial instruments that he had in trust for his sons

matured and could be forfeited.  Together, these payments have taken every asset that remained

out of Mr. Bui's life's work in the real estate business.  As a result of his prosecution in this case,

all of Mr. Bui's real estate holdings are "under water," and most are undergoing foreclosure,

including the houses in which his mother, brother and sister lived.  Weiss Decl. ¶ 9.  In addition,

Mr. Bui is being or will be sued by multiple banks and is exposed to a series of default

judgments that he will never be able to satisfy.  Coupled with the forfeiture judgment in this

case, Mr. Bui is ruined and it is extremely unlikely that he will ever recover from the financial

penalties that he has suffered as a result of his criminal conduct.  *Id.*, ¶ 13.  In sum, the plea

agreement imposes a permanent punishment from which he can never escape.

Unusually in these times of binding Rule 11(c)(1)(C) plea agreements, the agreement in

this case specifically provides that Mr. Bui may argue for a variance from the guideline range.

There can be no question that Mr. Bui has demonstrated acceptance of responsibility above and

---

payment history of each loan to determine the amount owed, minus interest, late fees and
penalties and the current disposition of each piece of property secured against each loan.  To
complicate matters further, there may be a requirement to determine whether the original lender
for each piece of property continues to hold the mortgage or if, as is common, the original lender
subsequently sold the loan to a successor lender.   *United States v. James*, 592 F.3d 1113, 1115-
16 (10th Cir. 2010).  If successor lenders suffered losses, the question arises as to how
foreseeable those losses were.  *Id.*, 592 F.3d at 1115 (noting that the sentencing court found the
losses, if any, suffered by successor lenders to "not constitute reasonably foreseeable harm").  In
the event that successor losses were sustained and were reasonably foreseeable to the defendant,
"to the extent that any original lender sustained an actual loss, that loss is the difference between
the outstanding balance on the original loan and what the lender received when it sold the loan."
*Id.* at 1115.
        The manner in which banks securitized mortgages adds exponential complexity to the
process of assessing loss.  As set forth under Factor 1(B), Nature of the Offense, *infra*,
mortgages obtained from financial institutions were sold, re-sold and packaged into investment
vehicles at the level of banking institutions far removed from Mr. Bui's local brokerage.
Understanding which, if any, of the mortgages in any of the mortgage cases before this Court
produced a default therefore presents a forensic challenge of enormous proportions.

Def's Sent. Memo.                              5

beyond that typically seen in criminal cases.  Mr. Bui could have chosen to contest the charges, which would have put the government to the expense and burden of laboriously proving the amount of fraud through documents that it would have had to obtain from multiple banks.  In the process, Mr. Bui could have spent money that he instead chose to forfeit.  He could have forced the government to publicly reveal the many cooperators in the related cases who provided information against him.  He could have declined to provide the financial statement.  He could have attempted to complicate collection efforts against his assets.  Mr. Bui did none of these things, and instead, did something extraordinary.  He quickly confessed the full extent of his fraud and then promptly volunteered his assets for forfeiture.  This conduct reflects the characteristics of responsibility and low likelihood of recidivism that render a 41 month sentence greater than necessary to achieve the goals of sentencing.  Such conduct should be encouraged through imposition of a sentence that reflects the extraordinary acceptance of responsibility that it entails and the enormous savings of judicial, governmental and public resources that it has worked.

### (ii).    Extraordinary Family Circumstances

The defense and the Probation Officer agree that a lower sentence is warranted in view of the hardship created by the autism of Justin Bui and the effect that coping in Mr. Bui's absence is having on Ms. Tran.  The defense submits that the recommended 41 months is greater than necessary to achieve any of the statutory sentencing goals.  Retribution already has been severe – Mr. Bui has forfeited everything he owns, including the trusts he set up for the care of his children, he has seen his mother, brother and sisters turned out of the homes he bought for them, he has lost his means of livelihood and will be forever subject to a crippling forfeiture judgment that will tax every penny he is able to earn in the future.  Weiss Decl. ¶¶ 7-9.  Most severe of all is the knowledge that his financial ruin has permanently lowered the level of care that he can provide to his autistic son.  As set forth below, under Factor 2, a sentence of 25 months provides sufficient specific and general deterrence (educational and vocational training would best be conducted outside of prison walls).

In addition to working against the purposes enumerated in section 3553, the justification

1   for the Probation Officer's recommendation conflicts with the relevant guidelines case law.   The

2   departure cap of 41 months appears to rest on Mr. Bui's having committed his offense conduct in

3   the knowledge that his son is autistic and that his offense is a grave one with potentially serious

4   consequences to others.   PSR, Justification, p. 2.   While both of these observations are probably

5   true (albeit, as set forth below, the picture of the overall offense conduct is more complex than

6   might appear at first glance), the degree of a defendant's culpability or the nature of his moral

7   lapses are not legally relevant factors in analyzing the particular downward departure ground of

8   extraordinary family circumstances.   A departure based on the defendant's family circumstances

9   is not because the "circumstances decrease [a defendant's] culpability, but that [the courts] are

10  reluctant to wreak extraordinary destruction on dependents who rely solely on the defendant for

11  their upbringing."   *United States v. Johnson*, 964 F. 2d 124, 129-30 (2nd Cir. 1992).

12      Post-*Booker*, sentencing courts continue to depart based on § 5H1.6, "Family Ties and

13  Responsibilities" but they now have more freedom to do so than before, where the circumstances

14  were required to be so unusual as to take the case outside the "heartland of cases."   *United States

15  v. Antonakopoulos*, 399 F.3d 68, 83 (1st Cir. 2005) (district court denied downward departure

16  where defendant failed to show he was an "irreplaceable" care taker for his brain damaged son,

17  but on appeal post-*Booker* defendant may argue that absent mandatory Guidelines the district

18  court would have given him a different sentence).

19      The Ninth Circuit, like its sister circuits, looks to whether the defendant's financial

20  support or care giver services are irreplaceable when deciding whether or not departure is

21  warranted.   *See, e.g., United States v. Leon*, 341 F.3d 928, 931 (9th Cir. 2003) (departure

22  warranted where defendant was care taker for his terminally ill wife).   Whether or not a care

23  taker defendant is "irreplaceable," however, is not solely dependent on the defendant's being the

24  only person responsible for a dependant's care or the "last man standing."   Instead, the Ninth

25  Circuit precedent, and that of its sister circuits, indicates that a court considering a departure

26  based on exceptional family circumstances should "assess the nature of the care that the

27  defendant provides to his or her family members and determine whether "there are *feasible*

28  alternatives of care that are relatively comparable" to the defendant's."   *United States v.*

1   *Menyweather*, 447 F.3d 625, 633 (9th Cir. 2006) (affirming district courts departure based on

2   defendant's close relationship with her 11 year old daughter) citing to *United States v.Roselli*,

3   366 F. 3d 58, 68-69 (1st Cir. 2004) (approving departure based on defendant's role as care taker

4   of disabled children with his wife and testimony that removing defendant from the family would

5   cause stress to the wife and exacerbate her own illnesses).

6        Because the Ninth Circuit has yet to apply this standard in the context of a parent caring

7   for a child suffering from autism or other similar developmental disorders, cases from other

8   circuits provide persuasive authority for departure in the circumstances of this case.  In *United*

9   *States v. Spero*, 382 F. 3d 803, 803-04 (8th Cir. 2004), the Eight Circuit  affirmed a district

10  court's sentence of a bank fraud defendant.  After granting an eight-level downward departure,

11  the district court sentenced Spero, to periods of home detention, community confinement and

12  five years probation.  *Id.*  Spero was married with four children, one of whom suffered from

13  autism.  *Id.* at 804.  The government appealed, among other things, the district court's decision

14  to depart based on Mr. Spero's family circumstances.  *Id.*  On appeal, the Eighth Circuit affirmed

15  the district court's departure decision but not before reviewing precisely why the child's autism

16  diagnosis necessitated the defendant's sentence.

17       The Eight Circuit began by explaining that the symptoms or behavioral difficulties

18  associated with an autism diagnosis include "behavior rigidity" (citing to the testimony of the

19  child's doctor) and adherence to "inflexible, nonfunctional rituals or routine . . . [that] may

20  become upset with even trivial changes in [the patient's] environment."  *Id.* at n. 3 (quoting PDR

21  Medical Dictionary).  The appellate court then credited Ms. Spero's testimony that "the slightest

22  change in [their son's] daily routine can cause him to become extremely upset and violent" and

23  the opinion of the child's physician that "removing Spero from the house would be detrimental

24  to [the child]."  *Id.* at 805.  Based on Ms. Spero's testimony and that of the child's doctor, the

25  appellate court agreed with the district court that "Spero's role in [the child's] life is

26  indispensable because having a routine is invaluable to [the child's] further development."  *Id.*

27  The Eight Circuit concluded that "[w]hen one parent is critical to a child's well-being, as in this

28  case, that qualifies as an exceptional circumstance justifying a downward departure."  *Id.*

1    A similar result was reached in *United States v. Sclamo*, 997 F.2d 970 (1st Cir. 1993).  In

2    *Sclamo*, the First Circuit affirmed a district court's decision to depart based on the defendant's

3    family circumstances and the resulting sentence of home detention and probation.  *Id.* at 974.

4    Mr. Sclamo urged departure based on his relationship with his live-in girlfriend's twelve year old

5    son James.  *Id.* at 972.  James exhibited symptoms of attention deficit disorder and displayed

6    aggressive behavior after being physically abused by his birth father.  *Id.*  When Sclamo began to

7    live with the child and attend meetings with the child's psychologist, the child's behavior began

8    to improve.  *Id.*  At sentencing, the district court considered reports from the child's psychologist

9    that credited Sclamo for the child's improvement and that urged that Sclamo's "continued

10   presence was necessary for James's increasing progress."  *Id.* (internal quotations omitted).  On

11   appeal, the First Circuit agreed:

> we think that Sclamo's situation is readily distinguished from ordinary cases, where
> one can only speculate about the stresses that incarceration of a family member
> might cause. In this case, there is evidence not only that James already suffers from a
> clinical disorder, but that his condition will deteriorate if defendant is incarcerated.  .
> . . The psychologist's prognosis that James would risk regression and harm if
> defendant were incarcerated amply supports the district court's determination.

*Id.* at 974.

17   Further guidance can be found in the case of *United States v. Lehman*, 513 F.3d 805 (8th

18   Cir. 2008).  In *Lehman*, the district court departed from a calculated Guidelines range of 37 to 46

19   months and imposed a sentence of six months community confinement and five years probation.

20   *Id.* at 806-07.  Prior to sentencing, Lehman pleaded guilty to a felon in possession of a firearm

21   offense after her 14-year-old daughter accidentally killed herself with Lehman's gun.  *Id.* at 806.

22   At sentencing the defense presented evidence that Lehman's other child exhibited symptoms of

23   ADD and Asperger's disorder (a milder disorder on the autism spectrum).  *Id.* at 807.  The

24   defense presented testimony from a psychologist who concluded that the child was very close to

25   his mother and that separation from her would cause him to "decompensate emotionally, and

26   suffer a setback in his overall development."  *Id.* (internal quotations omitted).  While the

27   defense argued that the child was not similarly attached to his father and stepmother, the

28   government presented evidence that the child's father – a long time primary or joint custodial

1   parent – and stepmother were ready and able to care for him during his mother's incarceration.

2   *Id.* at 806-07.  After weighing the testimony, the district court sentenced the defendant based, in

3   part, on its desire to prevent any additional suffering to the child.  *Id.* at 807.

4           The Eighth Circuit began its analysis by noting that prior to the Supreme Court's decision

5   in *Gall*, it routinely vacated sentences that imposed probation where the Guidelines

6   recommended incarceration.  *Id.* at 809.  The court explained, however, that *Gall* instructed

7   sentencing courts and appellate courts to consider probation an appropriate sentence where

8   "compelling family circumstances . . . [indicate that] individuals would be very badly hurt in the

9   defendant's family if no one is available to take care of them."  *Id.* quoting *United States v. Gall*,

10  552 U.S. 38, 128 S. Ct. 586, 602 (2007).  The court concluded that given *Gall's* instruction, the

11  district court appropriately "accepted expert testimony that sending Lehman to prison would

12  have a very negative effect on the emotional development of her young son."  *Id.* at 809.

13          As in these other cases, the circumstances in this case warrant a sentence lower than 41

14  months.  Justin is a severely impaired autistic child, currently enrolled in the San Jose Unified

15  School District's intensive treatment program for special needs children.  Report of Robert

16  Kaufman, Ph.D, A.B.P.P. ("Kaufman Report"), attached as Exhibit A to Declaration of Mary

17  McNamara ("McNamara Decl."), served and filed herewith, at 8, 10; see also Individualized

18  Education Program reports for Justin Bui, attached as Exhibits D-H to McNamara Decl.  At the

19  age of four, he was not toilet trained and was difficult even to test because his language skills

20  were so limited.  Kaufman Report at 9.  Per one of his special education teachers,

21  communication of protest is often through "hitting, scratching or biting."  *Id.* at 10.

22          Justin is highly active and requires virtually constant supervision.  Kaufman Report at

23  11.  He is prone to rapid and extreme changes in mood and behavior.  He will readily break

24  down into lengthy tantrums with little provocation and can be very difficult to calm down or

25  soothe.  *Id.*  As the Probation Officer observed during her home visit, "Justin [is] very difficult to

26  control.  He was unable to sit or stand for even short periods of time, and spent time playing with

27  toys or climbing on his mother."  PSR, ¶ 67.  He needs one of his parents to sleep with him, and

28  since Mr. Bui's incarceration, getting him to sleep at all has been increasingly difficult.

1   Kaufman Report at 11, 17.

2        Early and comprehensive intervention is paramount to achieving the best possible

3   outcomes for autistic children. Kaufman Report at 5. The family members in the home who are

4   present on a more permanent basis are simply unable to cope. Ms. Tran's brother suffers from

5   severe depression, is unreliable in terms of availability and is himself dependent on Ms. Tran and

6   Mr. Bui. Likewise, Ms. Tran's elderly mother is dependent due to her medical problems and

7   frailty. Kaufman Report at 6, 13. While both Ms. Tran and Mr. Bui have siblings in the Bay

8   Area, they do not live within easy commute of the home (with the exception of Ms. Tran's sister,

9   Helen, who has two autistic boys of her own). *Id.* at 7. In any event, the nature and severity of

10   Justin's autism is such that he requires a care giver at the level of a parent who provides

11   intensive care for hours every day. As Dr. Kaufman explains, "[a] hallmark of Autistic Disorder

12   is that these children have tremendous difficulty forming and sustaining meaningful relational

13   bonds with other people, even close family members who see them every day." *Id.*, at 18. As is

14   typical of autistic children, Justin rigidly adheres to routine and becomes upset at even slight

15   deviations from patterns. *Id.*, at 11-12. Hiring a babysitter or having relatives take turns in

16   caring for Justin will not work in view of the nature of Justin's disorder. *Id.*, at 20. Taking care

17   of Justin requires skill at understanding the highly idiosyncratic world of an autistic youngster

18   and "even a caretaker who has some experience with autistic children would have a steep

19   learning curve to understand the specifics of Justin's social and emotional life." *Id.*

20        Mr. Bui's absence has been damaging to Justin and has imposed a burden on Ms. Tran

21   that is becoming increasingly difficult for her to bear. Because he had a flexible work schedule,

22   Mr. Bui was the parent who had most interaction with Justin's teachers, taking him to and from

23   school and therapy appointments and reinforcing those lessons at home. Kaufman Report at 12;

24   Letter of Katie Moekel (Justin's special education teacher), attached as Exhibit B to McNamara

25   Decl. ("John fought, along with his wife, to convince the school district to provide home services

26   to extend the work that they were already doing because they were able to provide examples of

27   how Justin worked with them at home on his IEP goals. This was something I found unique to

28   this family.") Since Mr. Bui's incarceration, Justin has lost one of his two attachment figures

and has regressed in speech and language capabilities, has increased behavioral problems,

including increased incidence of tantrums, has decreased ability to sleep and is more finicky in

his eating habits (which were already beset by signs of a disturbing obsessiveness). *Id.*, at 17.

He is also now no longer reliably toilet trained.  Letter of Linne Bui to the Court, attached as

Exhibit C to McNamara Decl., at 1-2.   As Dr. Kaufman notes, "[a]ny deviation from the

schedule can result in a prolonged tantrum."  Ms. Tran is heading for a breakdown.  She has lost

weight, and is increasingly distraught and overwhelmed by her autistic son.  *Id.*  She and her nine

year old son, Matthew, have to hold Justin down so that her elderly mother can brush his teeth.

There are times when it takes her two hours to feed him.  *Id.*, at 17-18.  Ms. Tran also describes

how "Justin's deficits are such that he requires 24 hour monitoring to ensure that he does not

harm himself, disturb the neighbors or wreck the house."  *Id.*, at 2.  After Mr. Bui's arrest,

Justin's speech skills regressed to those of a child of one year and eleven months – he was five

years and four months at the time.  *Id.*, at 2.  Whereas Mr. Bui was the one who would sleep with

Justin, Ms. Tran now has to do so and she reports getting only three hours of sleep most nights.

*Id.*, at 3.  She is stretched too thin to be able to bring Justin to the classes that he had before Mr.

Bui's incarceration and will not be able to keep this pace up on a long term basis.  *Id.*, at 4.  In

addition, the toll that caring for Justin has taken on her has meant that her other son, Matthew is

suffering from parental neglect such that he will likely suffer from emotional problems.  *Id.*, at

21-22.  "I am stretched to the breaking point with Justin, and Matthew is simply having to cope

on his own."  Linne Tran Letter, McNamara Decl. Exh C, at 5.  Dr. Kaufman describes the

situation as "a recipe for disaster."  Kaufman Report at 23.  Mr. Bui's absence has been

detrimental to Justin's development and there is considerable risk now that adaptive skills

necessary for Justin to have any chance at better functioning will be lost or not achieved at all.

*Id.*  In addition, his absence is threatening Ms. Tran's physical and emotional health – she

appears close to crisis due to the strain of taking care of Justin.  She is increasingly distraught

and overwhelmed and there is nobody to whom she can turn.  These circumstances are

extraordinary and warrant a sentence lower than 41 months.  Even at 25 months, the sentence

requested by the defense would still impose extraordinary hardship on the family.  Mr. Bui

1  would be away from the family for another year, during which time, Ms. Tran will be required to

2  continue to meet the heroic challenges that she faces on her own.

3  **Factor 1:**

4  **B.     Nature of the Offense**

5        It is true, as the PSR points out, that as a result of conduct such as Mr. Bui's, "[t]he banks

6  have suffered from untold losses when borrowers are no longer able to afford their loans" and

7  that "those borrowers have lost the money they invested in their homes when they have been

8  foreclosed upon." PSR, Justification page 2. In fairness however, it should be pointed out that

9  neither the banks nor the borrowers were innocent victims and both share responsibility for the

10 credit crisis. In the case of the banks, the responsibility is both vastly greater and the

11 accountability vastly less than that being applied to Mr. Bui. Overall, Mr. Bui's conduct can be

12 understood as part of a vast web of illegal, dishonest and reckless behavior that occurred in every

13 town and city in the United States.

14       In terms of the more sympathetic participants – the borrowers, Mr. Bui did not prey on

15 low-income, equity rich people in an effort to convince them to take out unnecessary home

16 equity lines. Many of the borrowers during the boom period were engaged in real estate

17 speculation – buying in order to "flip." Others were striving to buy their own homes and take

18 advantage of the sharp appreciation in real estate values to get into the property market. The

19 long-term affordability of a mortgage did not concern them, their goal was to acquire assets that

20 would continue to appreciate. *See* Les Christie, Report shows real estate investors making fewer

21 buys; vacation-home purchases show increase, CNNMoney.com, Apr. 30, 2007,

22 http://money.cnn.com/2007/04/30/real_estate/speculators_fleeing_housing_markets/index.htm

23 (discussing how "[a]fter years of big increases in the buying of real estate for investing,

24 speculators fled many housing markets" when prices began dropping in late 2006). Together

25 with Mr. Bui, the borrowers were engaged in a charade with complicit banks in order to obtain a

26 valuable asset – a home – whose value appeared forever to be increasing. The favored vehicle to

27 do this was "stated income" loans, which required no backup documentation to prove the

28 representations made by the borrower. The stated income loans were subject to such notorious

Def's Sent. Memo.                              13

abuse by borrowers that they were widely known in the industry as "Liar Loans."  *See* Mark

Gimein, *Inside the Liar's Loan: How the Mortgage Industry Nurtured Deceit*, Slate, Apr. 24,

2008, http://www.slate.com/id/2189576/ (liar's loan "is mortgage-industry slang for what's more

formally called a "stated income" mortgage—a mortgage that a lender gives without checking

tax returns, employment history, or pretty much anything else.")  At one point, these Liar Loans

comprised a full 50% of the subprime market.[4]

The more culpable participants, the lenders, routinely engaged in practices that have been

widely condemned as predatory.  Liar Loans were quickly accompanied by loans based only on

the initial interest rate provided for in the adjustable rate mortgage.  This meant that lenders "did

not even consider how homeowners would be able to pay their loans once the payment adjusted

upward."  Ellen Harnick, Center for Responsible Lending, Testimony before the U.S. House

Committee on Veterans' Affairs Subcommittee on Economic Opportunity: *The Subprime*

*Mortgage Crisis and America's Veterans,* (Feb. 28, 2008), at 4,

http://www.responsiblelending.org/mortgage-lending/policy-legislation/congress/ellen-harnick-t

estimony-veterans-affairs-feb-08.pdf   The lenders' incentive for extending such risky loans was

to make a quick profit by securitizing them.  Days after a loan was made, the lender pooled or

bundled the loan with other loans and sold them as mortgage-backed securities.  The lender

made its profit regardless of whether the application provided truthful financial information and

regardless of whether the mortgage was ever paid back.[5]

---

[4] Harnick, *supra*, at 4 ("many lenders qualified borrowers without any verification of
income at all, using so-called "stated-income" or "no-doc" loans . . . loans underwritten using
less than full documentation standards comprise more than 50 percent of the subprime sector . . .
[i]n many cases, lenders combined multiple risk elements in one loan, such as hybrid ARM
products with no documentation of income and no escrow.") (internal quotations omitted).

[5] [R]egulatory changes and the ongoing growth of the secondary mortgage market
increased the ability of lenders, who once typically held mortgages on their books
until the loans were repaid, to sell many mortgages to various intermediaries, or
"securitizers." The securitizers in turn pooled large numbers of mortgages and
sold the rights to the resulting cash flows to investors, often as components of
structured securities. This "originate-to-distribute" model gave lenders (and, thus,
mortgage borrowers) greater access to capital markets, lowered transaction costs,

1    Indeed, lenders often profited more from the risky subprime loans than they would have

2    done from loans based on conventional lending practices.  Harnick, *supra*, at 5 ("the CEO of one

3    mortgage lender explained it this way to the New York Times, "The market is paying me to do a

4    no-income-verification loan more than it is paying me to do the full documentation loans," he

5    said. "What would you do?").  Lenders and bank employees also encouraged mortgage brokers

6    to close stated-income by whatever means necessary – they were not above encouraging fraud.

7    *See* Steven Krystofiak, President, Mortgage Brokers Association for Responsible Lending,

8    Testimony before the Federal Reserve (Aug. 2006), *available at*

9    http://www.federalreserve.gov/secrs/2006/august/20060801/op-1253/op-1253_3_1.pdf. [6]

10    As the PSR notes, the question remains as to where Mr. Bui fits into this picture, in terms

11    of how many of his borrowers are now unable to make mortgage payments.  As set forth above,

12    the government and the defense agreed to use Mr. Bui's gain as a sentencing measure thereby

---

14    and allowed risk to be shared more widely . . . The originate-to-distribute model
      seems to have contributed to the loosening of underwriting standards in 2005 and
15    2006. When an originator sells a mortgage and its servicing rights, depending on
      the terms of the sale, much or all of the risks are passed on to the loan purchaser.
16    Thus, originators who sell loans may have less incentive to undertake careful
      underwriting than if they kept the loans.
17
18    Ben S. Bernanke, Chairman, Fed. Reserve, Testimony before U.S. House of Representatives,
      Committee on Financial Services: *Subprime mortgage lending and mitigating foreclosures*,
19    (Sept. 20, 2007), at 1-2, *available at* http://www.federalreserve.gov/newsevents/testimony/
      bernanke20070920a.htm.
20

21    [6] In turn, Wall Street encouraged these lending practice "because they helped feed a
22    pipeline of securities backed by the mortgages, a market bigger than the one for United States
      Treasury bonds and notes."  *See* Vikas Baja et al., *Tremors at the Door – More People with*
23    *Weak Credit are Defaulting on Mortgages*, The New York Times, Jan. 26, 2007, *available at*
      http://query.nytimes.com/gst/fullpage.html?res=9504E5DD173FF935A15752C0A9619C8B63.
24    While foreclosures played a part in causing the overall fiscal crises, Wall Street's frantic selling
25    of mortgage backed securities and credit-default swaps, without accounting for the risks inherent
      in subprime lending, brought the credit markets to a halt and truly precipitated the collapse.
26    Joseph Stiglitz, The Capitalist Fools, Vanity Fair, January 2009, *available at*
      http://www.vanityfair.com/magazine/2009/01/stiglitz200901 ("The problem is that, with this
27    complicated intertwining of bets of great magnitude, no one could be sure of the financial
28    position of anyone else—or even of one's own position. Not surprisingly, the credit markets
      froze.").

avoiding the time-consuming and complex task of evaluating loss.  An important factor bearing on overall culpability however, is the issue of the foreseeability of the harm to the individual defendant.  During the relevant time period, virtually nobody foresaw the possibility of widespread foreclosures, much less the larger credit crisis.  Minds greater than Mr. Bui's simply were not alive to these possibilities:  "While I was aware a lot of these [subprime lending] practices were going on, I had no notion of how significant they had become until very late . . . I really didn't get it until very late in 2005 and 2006."  Remarks of Alan Greenspan, former Chair of the Federal Reserve, quoted in Mark Felsenthal, *Greenspan Says didn't see subprime storm brewing*, Reuters, Sept. 14, 2007, http://www.reuters.com/article/idUSWBT00756820070914; *see also* Edmund Andrews, *Greenspan is Concerned About 'Froth' in Housing*, New York Times, May 21, 2005, *available at* http://www.nytimes.com/2005/05/21/business/21fed.html?_r=1 ("Greenspan repeated many of his past reassurances about the housing market: that any bubbles were local, not national."); *see also* Robert Samuelson, *Economists Out To Lunch: Why did so many experts fail to predict the economic crisis?*, Newsweek, Jul. 7, 2009, http://www.newsweek.com/id/205522 ("One intriguing subplot of the economic crisis is the failure of most economists to predict it.").

None of this is to say that Mr. Bui should not face punishment, it is merely to say that, as factor number 2 of section 3553 provides, punishment should be just.

**Factor 2:**

**The Purposes of Sentencing (Just Punishment/Retribution; Specific Deterrence; General Deterrence; and Rehabilitation)[7]**

Consistent with section 3553(a), if the circumstances of a case reveal that the purposes of

---

[7] The four purposes of sentencing, codified in 3553(a)(2), are:

A.   To reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense ("just punishment/retribution");

B.   To afford adequate deterrence to criminal conduct ("general" deterrence);

C.   To protect the public from further crimes of the defendant ("specific" deterrence), and

D.   To provide the defendant with needed educational or vocational training, medical care, or correctional treatment in the most effective manner ("rehabilitation).

1    sentencing have been partially or fully achieved prior to imposition of sentence, a sentence

2    within the Guidelines range may be "greater than necessary" to fulfill those goals. *United States*

3    *v. Gaind*, 829 F. Supp. 669, 671 (S.D.N.Y. 1993); *see also United States v. Redemann*, 295 F.

4    Supp. 2d 887, 895 -96 (E.D. Wis. 2003) (accord).   Therefore, where a defendant suffers

5    consequences from his criminal conduct beyond those accompanying his criminal sentence, the

6    court may consider those consequences in attempting to "provide a just punishment for the

7    offense." 18 U.S.C. § 3553(a)(2)(A); *Gaind*, 829 F. Supp. at 671.  Mr. Bui has already suffered

8    severe consequences as a result of his conduct, and he will continue to suffer from them for the

9    rest of his life.

10        Two of the most important goals of punishment contained in section 3553(a) are the need

11   to protect the public from further crimes by the defendant and deterrence – both specific and

12   general. *Gaind*, 829 F. Supp. at 670.  As a result of his guilty plea, Mr. Bui broker's license will

13   never be renewed, his business, J.B. Financial, has been closed and he is permanently under the

14   hammer of a huge forfeiture judgment, plus will suffer a series of default judgments in all the

15   many cases in which he is a defendant.  Weiss Decl. ¶ 9.  All of this ensures the

16   "[e]limination of the [his] ability to engage in similar or related activities" and achieves the goal

17   of protecting the public from further crimes by Mr. Bui. *Id.* at 671; *see also United States v.*

18   *Joyeros*, 204 F. Supp. 2d 412, 440 (E.D.N.Y. 2002) ("The court may depart downward where

19   defendant's business has been destroyed, preventing re-entry into criminal life.").  Mr. Bui "is

20   now completely financially ruined and, given the size of the forfeiture judgment, not to speak of

21   the judgments likely to awarded against him in favor of the banks on the life insurance policies

22   and the further litigation that will ensue with respect to the commercial holdings that he is under

23   water on, Mr. Bui is extremely unlikely ever to recover from the financial penalties imposed in

24   this case."  Weiss Decl. ¶ 13.

25        On top of all of this, Mr. Bui is now witnessing his life partner, Ms. Tran, buckling under

26   the strain of coping virtually alone with their autistic son, seeing his mother, brother and sisters

27   being turned out of the homes he bought for them and "scrambling to make alternative living

28   arrangements" under the stress of the financial disaster that has befallen them in light of Mr.

1   Bui's criminal case.  Weiss Decl. ¶ 8.  Given the fact that Mr. Bui's entire life history has been to

2   take care of his family, through providing financial support, putting away money in trusts for his

3   children, buying houses for his mother and siblings, and spending virtually nothing on himself

4   (Weiss Decl. ¶¶ 5, 7; PSR ¶¶ 61-63, 68) these circumstances "constitute[] a source of both

5   individual and general deterrence."  *Gaind*, 829 F. Supp. at 671; *see also United States v. Olis*,

6   2006 WL 2716048, at * 13 (S.D. Tex. Sept. 22, 2006) ("the chastening effect of years in prison,

7   the attendant negative publicity, the loss of his job and accounting and law licenses, and the need

8   to provide support for his family will provide adequate deterrence against any potential future

9   criminal conduct.")  Further, to the extent the mortgage and financial crises have not alerted

10  other local brokers to the need to abstain from such practices, because of Mr. Bui's case and the

11  prison time and massive financial penalties that he will suffer, they "have doubtless already

12  learned through informal sources that loss of the business entity involved is an obvious

13  consequence of such illegal behavior."  *Gaind*, 829 F. Supp. at 671.

14          In short, not only has Mr. Bui and his family suffered tremendously following his arrest,

15  but many of the goals of punishment under section 3553(a) have already been achieved.  Mr. Bui

16  has lost his business and his professional license and will labor under a massive forfeiture

17  judgment.  Upon release from prison he will need to find new means by which to support his

18  family, including a severally autistic child whose care and development requires time-consuming

19  and expensive therapy and treatments.

20          **Factor 3:**

21          **The Kinds of Sentence Available (i.e. Alternatives to Prison)**

22          Mr. Bui has already served almost nine months in prison as a result of his conduct and

23  the defense requests a total sentence of 25 months, which the Court has discretion to do.  As set

24  forth above, the circumstances of this case provide the Court with an ample record upon which to

25  base a sentencing variance.

26  / / /

27

28

**Factors 4-5:**

**The Sentencing Guidelines and their Policy Statements (Which Are, after *Booker*, Advisory)**

Where a Sentencing Guideline is not the product of the Sentencing Commission exercising its "institutional role" of promulgating guidelines based on empirical data and the national experience, it is not an abuse of discretion for a sentencing court to conclude that the Guideline range is greater than necessary to achieve the purposes of sentencing in 18 U.S.C. section 3553(a). *Kimbrough v. United States*, 552 U.S. 85, 109-110 (2007); *see Spears v. United States*, __ U.S., __, 129 S. Ct. 840, 843 (2009) (explaining that when the Commission fails to fulfill its institutional role, a district court can vary from the guidelines "based on *policy* disagreement with them, and not simply based on an individualized determination that they yield an excessive sentence in a particular case") (emphasis added)[8].

The original fraud guidelines (formerly, § 2F1.1), adopted by the Sentencing Commission in 1987 following the Sentencing Reform Act of 1984, were the product of the kind of empirical analysis that warrants deference by the courts. In contrast, the two-and-a half to threefold increase in the fraud guideline ranges since the Commission's original work is not the product of empirical analysis and, therefore, under *Kimbrough*, a court may reject the suggested range if it finds that in Mr. Bui's case, the range yields a sentence greater than necessary to achieve sentencing goals.

Viewed in the light of the Supreme Court's guidance in *Kimbrough*, the ever more punitive evolution of the fraud guideline reveals a sentencing policy unmoored to reliable data.

---

[8] To the extent that the Court reads *United States v. Gonzalez-Zotelo*, 556 F.3d 736, 740-41 (9th Cir 2009), as standing for the proposition that sentencing courts may not depart based on a disagreement with congressional policy reflected in a guideline (as opposed to a disagreement with the Guidelines themselves), the holding of *Gonzalez-Zotelo* is inapplicable here. *Gonzalez-Zoleto*, at most, prohibits sentencing courts from departing based on disagreements with guidelines that result from a direct congressional *directive*. *Id.* The amendments to Section 2B1.1 applicable to Mr. Bui's case, discussed *infra* at, are not the result of a congressional directive. *See Fifteen Year Report* at App. B, Congressional Directives to the United States Sentencing Commission Subsequent to Enactment of the Sentencing Reform Act (listing no congressional directive for Amendment No. 154 and a directive regarding misrepresentations in connection with student loans as the only directive applicable to Amendment No. 617).

1   The original empirical work performed by the Commission in the fraud area led the Commission

2   to recommend **short** prison sentences for white collar offenders.  Part of the Commission's

3   analysis included a review of white collar sentencing including a study of pre-Guidelines

4   sentencing practice.  The Commission found that, "[a] large portion of fraud, embezzlement, and

5   tax evasion offenders received simple probation."  U.S. Sentencing Commission, *Fifteen Years*

6   *of Guidelines Sentencing: An Assessment of How Well the Federal Criminal Justice System is*

7   *Achieving the Goals of Sentencing* Reform, at 56 (Nov. 2004) [hereinafter *Fifteen Year Report*].

8   Accordingly, one of the key purposes of the original, 1987 fraud guidelines was to ensure that

9   white collar offenders faced "**short** but definite period[s] of confinement."  *Id.* (emphasis added).

10  Based on its study, the Commission opined that "the definite prospect of prison, **though the**

11  **term is short**, will act as a significant deterrent to many of these crimes, particularly when

12  compared with the status quo where probation, not prison, is the norm." U.S.S.G., ch. 1, intro.,

13  pt. 4(d) (1987) (emphasis added).  In sum, the Commission's empirical work supported short, but

14  definite sentences, not long ones.

15      Under the empirically-supported original fraud guideline, Mr. Bui's enhancement for

16  "loss" translates to an increase of 10 levels (U.S.S.G. § 2F1.1 (1987)), not 18, as suggested by

17  the current guideline, and his total adjusted offense level is 15, not 24 (base offense level of 6,

18  not 7, "loss" enhancement of 10, obstruction enhancement of 2, minus 3 levels for acceptance of

19  responsibility).  Accordingly, under the Commission's empirical analysis, Mr. Bui's sentencing

20  range would be18-24 months, or what the defense suggests is appropriate here, not the 51-

21  63months suggested by the current guidelines.  The Commission's progression from 18-24

22  months to the 51-63 month range reflects preferences of the Commission only, not reliable

23  research data.

24      For example, after a 1989 amendment, the fraud guidelines provided for a 13 point

25  enhancement for the "loss" figure in Mr. Bui's case.  U.S.S.G., App. C., Amend. 154 (Nov. 1,

26  1989).  Even according to the Commission, this three level increase from the original guideline

27  of 10 levels was not based on empirical research, but rather reflected the Commission's desire to

28  "conform the theft and fraud loss tables to the tax evasion table . . . [and] to increase the offense

levels for offenses with larger losses to provide additional deterrence and better reflect the

seriousness of the of the conduct.  *Id.*  In 2001, an amendment to the guidelines accelerated the

applicable enhancement to 18 levels.  U.S.S.G., App. C., Amend. 617 (Nov. 2001).  In adopting

this draconian increase, the Commission cited no research but rather asserted that it was

responding to "comments received from the Department of Justice, the Criminal Law Committee

of the Judicial Conference, and others, that [the fraud guideline] under-punish[es] individuals

involved in moderate and high loss amounts, relative to penalty levels for offenses of similar

seriousness sentenced under other guidelines." *Id.*[9]

　　　　The objective social science research refutes the Commission's unsupported position in

the fraud guideline that increasing the length of incarceration for white collar offenders promotes

the goals of sentencing.  *United States v. Aldelson*, 441 F. Supp. 2d 506, 514 (S.D.N.Y. 2006)

("there is a considerable evidence that even relatively short sentences can have a strong deterrent

effect on prospective "white collar" offenders"); *see also* David Weisburd et al., *Specific

Deterrence in a Sample of Offenders Convicted of White Collar Crimes*, 33 Criminology 587

(1995) (no difference in deterrence effect between probation and imprisonment for white-collar

defendants); *see also* Zvi D. Gabbay, *Exploring the Limits of the Restorative Justice Paradigm:

Restorative Justice and White Collar Crime*, 8 Cardozo J. Conflict Resol. 421, 447-49 (2007)

---

[9] Respected observers have noted for some time that these amendments reflect a de-coupling of objective research from sentencing policy.  *See, e.g.*, Fifteen Year Report at 56 ("the perceived absence of empirical research establishing the need for [the amendments], led one former Commissioner to warn that the SRA's promise of policy development through expert research was being supplanted by symbolic "signal sending" by Congress); *United States v. Aldelson*, 441 F. Supp. 2d 506, 514 (S.D.N.Y. 2006) (citing Kate Stith & Jose A. Cabranes, *Fear of Judging: Sentencing Guidelines in the Federal Courts* 69 (1998)) ("[Be]cause of their arithmetic approach and also in an effort to appear 'objective,' [the Guidelines] tend to place great weight on putatively measurable quantities, such [as] . . . [the] amount of financial loss in fraud cases, without, however, explaining why it is appropriate to accord such huge weight to such factors."); *United States v. Lenagh*, No. 8:07CR346, 2009 WL 296999, at *6 (D. Neb. Feb. 6, 2009).

("certainty of punishment is empirically known to be a far better deterrent than its severity . . . there is no decisive evidence to support the conclusion that harsh sentences actually have a general and specific deterrent effect on potential white-collar offenders."); *see also* Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime & Just. 1, 28 (2006) ("certainty and promptness of punishment are more powerful deterrents than severity . . .increases in severity of punishments do not yield significant (if any) marginal deterrent effects."). Even the authors of the Guidelines recognized that "short but definite period[s] of confinement" were appropriate to "ensure proportionate punishment and to achieve **adequate deterrence**." *Fifteen Year Report* at 56 (internal quotations omitted) (emphasis added).

Further, the research shows that "when criminal sanctioning was found to have [a deterrent] effect, it was accompanied by informal sanctions (such as social censure, shame, and loss of respect) which were **equally important in producing the deterrent outcome**." Gabbay, *Exploring, supra*, at 448-49 (emphasis added). In Mr. Bui's case, shame is a powerful factor – he has suffered the public humiliation of going from family savior to imprisoned criminal, from immigrant success story to ruined man, from successful provider to destitution. Mr. Bui's status in the community is further eroded by the fact that never again will he work in real estate, his profession for his entire adult life. Added to these strong social sanctions is the low likelihood of his recidivism. Given his age and complete lack of a criminal history, statistics show that he is very unlikely to re-offend. *See* U.S. Sentencing Commission, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines,* at Ex. 9 (May 2004) [hereinafter *Measuring Recidivism Report*]; U.S. Sentencing Commission, *Recidivism and the "First Offender,"* at 13- 14 (May 2004) [hereinafter *First Offender Report*]. While a 25 year old defendant in Criminal History Category I has a 22.3% chance of re-offending, a defendant of Mr. Bui's age (46) in the same criminal history category, has only a 6.9% chance of re-offending.

*Measuring Recidivism Report* at Ex. 9.  The Commission's research has also shown that offenders with zero criminal history points, have a recidivism rate of only 11.7%.  *First Offender Report* at 13-14.  Those who, like Mr. Bui with no arrest history, are even less at risk of recidivism, with a rate of only 6.8%.  *Id.* at 14.  In sum, social science research, including that conducted by the Commission, indicates that a shorter sentence is no more than necessary to achieve the statutory sentencing goals.

**Factor 6:**

**Avoiding Disparity in Treatment of Similar Offenders**

Of the related mortgage fraud cases before this Court, most involve cooperation clauses.  Although Mr. Bui was part of this larger group of people who engaged in the same conduct, the others appear to have cooperated against him, rather than he against them.  The defense expects that these cooperators will receive generous 5K recommendations from the government that may well put them at or below the defense sentencing request in this case.

**Factor 7:**

**The Need to Provide Restitution**

There is no restitution in this case, but there is an onerous forfeiture judgment.  Mr. Bui has already partially satisfied this judgment and is due to make another payment in May.  Imposing a sentence of 41 months, rather than the 25 requested by the defense serves only to retard his ability to make additional payments.

**III.    CONCLUSION**

The Supreme Court, starting with its decision in *Booker*, has consistently instructed the sentencing courts to implement the "uniform and constant [] federal judicial tradition for the sentencing judge to *consider every convicted person as an individual* and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and

Def's Sent. Memo.                                       23

punishment to ensue." *Gall v. United States*, 552 U.S. 38, 52 (2007), *quoting Koon v. United States*, 518 U.S. 81, 113 (1996) (emphasis added).  Given the facts set forth herein, the defense respectfully submits that a sentence of 25 months is sufficient, but not greater than necessary to achieve the statutory sentencing goals set forth in 18 U.S.C. section 3553.

Dated: February 24, 2010                                    Respectfully submitted,




_____/s/_____
Mary McNamara
Britt Evangelist
SWANSON & McNAMARA LLP
Attorneys for JOHN BUI